# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |
|---|---|
| **KATHERINE ELISABETH PATTERSON**<br><br>**Plaintiff,**<br><br>v.<br><br>**EXPERIAN INFORMATION SOLUTIONS, INC.,**<br>SERVE:  CT Corporation System, Reg. Agent<br>        4701 Cox Rd., Ste. 285<br>        Glen Allen, VA 23060-6808<br><br><br>**TRANS UNION, LLC,**<br>SERVE:   Corporation Service Company, Reg. Agent<br>        100 Shockoe Slip, FL 2<br>        Richmond, VA 23219-4100<br><br>**NATIONAL CREDIT SYSTEMS INC,**<br>SERVE:  CT Corporation System, Reg. Agent<br>        4701 Cox Rd., Ste. 285<br>        Glen Allen, VA 23060-6808<br><br>**TXU ENERGY RETAIL COMPANY,**<br>SERVE: Capitol Corporate Services, Inc., Reg. Agent<br>        1501 S. Mopac Expy, Suite 220,<br>        Austin, TX 78746<br>and<br><br>**MRS BPO, LLC**<br>SERVE: Any Officer<br>        402 Lippincott Drive<br>        Marlton, NJ 08053<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**Civil Action No.** <u>3:26cv203</u> |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Katherine Elisabeth Patterson, by counsel, and for her

Complaint against Defendants Experian Information Solutions, Inc. ("Experian"), Trans Union,

LLC ("Trans Union"), National Credit Systems, Inc. ("National Credit"), TXU Energy Retail Company ("TXU Energy"), and MRS BPO LLC ("BPO"), she states as follows:

## PRELIMINARY STATEMENT

1.      This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA") and the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p ("FDCPA").

2.      Equifax, Experian, and Trans Union are the USA's major consumer reporting agencies (hereinafter, these 3 are collectively referred to as the "CRAs", whereas Experian and Trans Union are referred to as the "CRA Defendants").

3.      The Fair Credit Reporting Act and Fair Debt Collection Practices Act provide federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act and the Fair Housing Act.

4.      Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination,'" as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights."

2

5.      Not only do inaccurate consumer reports lead to discrimination against consumers, but they also make it more difficult for banks and other finance companies to efficiently extend offers of credit to qualified individuals. The most obvious example occurs when a consumer applies for credit, is subsequently denied due to inaccurate information on their report, and the lender loses what would have been a potential customer. The inaccuracies not only harm the consumer, but they also deny the potential lender an opportunity to assess that consumer's creditworthiness accurately.

6.      In addition to relying on consumer reports to evaluate direct credit applications, many companies use CRAs to "prescreen" consumers' eligibility for particular offers.

> In prescreening, a creditor or insurer establishes a set of specific credit criteria (such as a minimum credit score) and requests from a CRA the names, addresses, and certain other information on consumers in the CRA's database who meet the specified criteria. Alternatively, the creditor or insurer may provide a list of potential customers to the CRA and request that the CRA identify which consumers on that list meet the established credit criteria.

BD. OF GOVERNORS OF THE FED. RESERVE SYS., *Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit and Insurance*, 7 (2004), Available at https://www.federalreserve.gov/boarddocs/rptcongress/UnsolicitedCreditOffers2004.pdf.

7.      If there is inaccurate information on a consumer's report, the CRA and lender may wrongfully exclude that consumer from certain "prescreened" offers. In this situation, the inaccuracies both preclude the individual consumer from receiving the credit offers and impede the lender's ability to use prescreening as a tool for "market efficiencies and better control of risks" *See, e.g., id*. at 10.

8.      The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a

consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

9.      The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from their creditor-customers (like National Credit and TXU Energy), particularly when a consumer makes a dispute about information reported.

10.     Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, those entities are National Credit and TXU Energy (the "Furnishers" or "Defendant Furnishers"). The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

11.     Plaintiff brings claims under Section 1681e(b) against Trans Union and Experian because each reported inaccurate account information about Plaintiff regarding fraudulent accounts with Defendant Furnishers, Defendant BPO, and other entities. When Plaintiff disputed the inaccuracies, Trans Union and Experian did not reasonably investigate, also violating Section 1681i.

12.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how the CRAs have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. The CRAs have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than

an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

14. Likewise, National Credit and TXU Energy violated the FCRA, Section 1681s-2(b), when they received Plaintiff's disputes from the Defendant CRAs and failed to reasonably investigate those disputes. Instead, discovery will show all Furnisher did was consult their own records regarding the accounts at issue and confirm to the agencies the inaccurate information they were already reporting. The Furnishers failed to correct the fraudulent reporting on Plaintiff's credit despite receiving ample notice that Plaintiff is a victim of identity theft.

14. Finally, Defendant BPO began reporting on Plaintiff's credit prior to contacting her, in violation of 15 U.S.C. § 1692f, 15 U.S.C. § 1692d, & 12 C.F.R. § 1006.30(a). By these actions, BPO engaged in unfair and unconscionable conduct, the natural consequence of which is to harass, oppress, or abuse Plaintiff in connection with the collection of a debt.

## JURISDICTION AND VENUE

15. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1681p, and 15 U.S.C. § 1692e.

16. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) & (2). All Defendants are residents of the Commonwealth of Virginia and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Division. Defendant Experian issued an inaccurate and defamatory consumer report regarding Plaintiff to Capital One in Virginia.

## PARTIES

17. Plaintiff is a natural person residing in Philadelphia County, Pennsylvania, and at all times relevant to the Complaint was a "consumer" as defined by 15 U.S.C. § 1681a(c).

18.    Experian is a foreign corporation authorized to do business in the Commonwealth of Virginia through its registered agent in Glen Allen, VA.

19.    Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.    Experian disburses consumer reports to third parties under contract for monetary compensation.

21.    Trans Union is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

22.    Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

23.    Trans Union disburses consumer reports to third parties under contract for monetary compensation.

24.    National Credit is a foreign corporation conducting business in Virgina through its registered agent: CT Corporation, 4701 Cox Rd Ste 285, Glen Allen, VA, 23060.

25.    National Credit is a "furnisher" of information as governed by 15 U.S.C. § 1681s-2.

26.    BPO is a foreign limited liability company with its principal place of business located at 402 Lippincott Drive, Marlton, NJ 08053.

27.    BPO is a "furnisher" of information as governed by 15 U.S.C. § 1681s-2.

28.     BPO is a "debt collector" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6). Specifically, BPO uses instrumentalities of interstate commerce or the mails in its business, the principal purpose of which is the collection of debts. BPO regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. No exception to the term "debt collector" applies to exempt BPO from regulation under the FDCPA.

29.     Defendant TXU Energy is foreign company headquartered in Irving, Texas. TXU Energy's registered agent is Capitol Corporate Services, Inc., 1501 S. Mopac Expy, Suite 220, Austin, TX 78746.

30.     TXU Energy is a "furnisher" of information as governed by 15 U.S.C. § 1681s-2.

## FACTUAL ALLEGATIONS

### *Section 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

31.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

7

32.    "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

33.    Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

34.    Section 1681e(b) sets forth the CRAs' overall du[t]y:

8

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

35.    Section 1681i(a), on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency of the directly… of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

36.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

37.     It has long been the law that a CRA, such as Trans Union or Experian, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270

9

(11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

38.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other  sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).  Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

39.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

40.     Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or

certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at \*4.

41.     It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

### Section 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty on Furnishers Such as National Credit & TXU Energy to Perform a Detailed and Systematic Investigation of a Consumer's Dispute

42.     Today, furnishers such as National Credit and TXU Energy have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. The duties on furnishers were enacted thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

43.     Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs. Further, the furnisher must report the results of this investigation to the CRAs and accurately

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

correct, update, or delete incorrect information previously reported to the CRAs.

44.    "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

> 357 F.3d 426, 430 (4th Cir. 2004).

45.    National Credit was aware of this duty to Plaintiff, and despite this awareness, it chose to ignore its responsibilities under the FCRA.

46.    TXU Energy was aware of this duty to Plaintiff, and despite this awareness, it chose to ignore its responsibilities under the FCRA.

***Plaintiff Discovers the CRA Defendants were Reporting Inaccurate Information Regarding Several Fraudulent Accounts and Disputes Those Inaccuracies***

47.    Plaintiff is a victim of identity theft.

48.    Upon information and belief, in late 2023, the identity thief stole Plaintiff's identity by opening an online account with Experian using Plaintiff's name and identifying information.

49.    On December 23, 2023, Plaintiff sent a properly addressed letter via postal mail with sufficient postage to Experian informing it that she was a victim of identity theft and that the Experian account had been fraudulently opened. Because the identity thief opened the account in Plaintiff's name and with her identifying information, Plaintiff was unable to create her own Experian account or access the account that was fraudulently opened in her name. To date, Plaintiff has been unable to obtain control over that fraudulently-opened Experian account.

50.    On June 6, 2024, Plaintiff accessed her credit reports and discovered that Experian and Equifax were reporting a collection account for a fraudulent debt that had been opened in

12

Plaintiff's name. Specifically, the fraudulent collection account was with National Credit Systems, Account # 54051**, the original creditor was listed as Copper Lodge Apartments, and the account was reporting with a past due balance of $5,915.00 (the "National Credit account").

51.    The information was inaccurate. Plaintiff did not open any account with Copper Lodge Apartments, she did not authorize anyone to open an account with Copper Lodge Apartments on her behalf, and she did not benefit from the account with Copper Lodge Apartments in any way. National Credit had no right to attempt to collect the Copper Lodge Apartments debt from Plaintiff.

52.    On June 7, 2024, Plaintiff submitted an FTC Identity Theft Report regarding the fraudulent National Credit account.

53.    On July 1, 2024, Plaintiff filed a report with the Philadelphia Police Department regarding the fraudulent National Credit account.

54.    On August 9, 2024, Plaintiff sent a properly addressed dispute letter with sufficient postage, via certified mail, to Equifax stating that the National Credit account was the result of identity theft and should be removed from her credit file. Plaintiff included proof of identity, a copy of her June 2024 FTC Identity Theft Report and July 2024 Philadelphia Police Department case card with this dispute to Equifax.

55.    On August 9, 2024, Plaintiff sent a properly addressed dispute letter with sufficient postage, via certified mail, to Experian stating that the National Credit account was the result of identity theft and should be removed from her credit file. Plaintiff included proof of identity, a copy of her June 2024 FTC Identity Theft Report and July 2024 Philadelphia Police Department case card with this dispute to Experian.

56.    On August 19, 2024, Experian received Plaintiff's dispute letter (USPS certified mail tracking number 7020-1810-0000-4129-3910).

57.    On August 21, 2024, Equifax received Plaintiff's dispute letter (USPS certified mail tracking number 7020-1810-0000-4129-3927).

58.    Plaintiff never received a response to her August 2024 dispute from Experian or Equifax.

59.    Plaintiff never received a notification from Experian that an identity theft block was processed or declined in response to Plaintiff's August 2024 dispute and identity theft notification.

60.    On October 3, 2024, the identity thief applied for a Capital One credit card in Plaintiff's name. Capital One accessed Plaintiff's Experian credit report, and Experian provided Plaintiff's credit report to Capital One which contained fraudulent, inaccurate, and derogatory information.

61.    Capital One is headquartered and maintains its principal place of business in McLean, Virginia. Capital One requested Plaintiff's credit files from Defendant Experian from its business based in Virginia and Defendant Experian furnished Plaintiff's credit file to Capital One's business in Virginia.

62.    On May 23, 2025, Plaintiff accessed her credit reports and found that Equifax had removed the National Credit account from her Equifax credit report. However, to Plaintiff's dismay, she discovered that Experian and Trans Union were reporting the fraudulent National Credit account as a derogatory account that was in collections with a past due balance of $5,915.00. In addition, Experian and Trans Union were now reporting a fraudulent TXU Energy Account #900065******** as a derogatory account that was in collections with a past due balance of $946.00 (the "TXU Energy account").

14

63.     The information was inaccurate. Plaintiff did not open the TXU Energy account, she did not authorize anyone to open the TXU Energy account on her behalf, and she did not benefit from the TXU Energy account in any way.

64.     On September 8, 2025, Plaintiff accessed her credit reports again, and to Plaintiff's dismay, found Experian and Trans Union were still reporting the fraudulent National Credit account as a derogatory account that was in collections with a past due balance of $5,915.00. In addition, Experian and Trans Union were still reporting the TXU Energy account as a derogatory account that was in collections with a past due balance of $946.00.

65.     On November 13, 2025, Plaintiff filed another report with the Philadelphia Police Department regarding the fraudulent accounts discovered on her credit reports.

66.     On November 18, 2025, Plaintiff submitted an FTC Identity Theft Report regarding the fraudulent TXU Energy account discovered on her credit reports.

67.     On November 20, 2025, Plaintiff accessed her credit reports again, and to Plaintiff's dismay, found Experian and Trans Union were still reporting the fraudulent National Credit and TXU Energy accounts as derogatory accounts that were in collections with past due balances. In addition, Plaintiff found that Experian was now reporting an additional fraudulent account under MRS BPO LLC Account #LU1XX2198****, with original creditor Spectrum, as a derogatory account that was in collections with a past due balance of $202.00 (the "BPO account").

68.     The information was inaccurate. Plaintiff did not open the Spectrum account, she did not authorize anyone to open the Spectrum account on her behalf, and she did not benefit from the Spectrum account in any way. BPO had no right to attempt to collect the Spectrum debt from Plaintiff.

15

69.    On November 24, 2025, Plaintiff submitted an FTC Identity Theft Report regarding the fraudulent BPO account she discovered on her credit reports.

70.    On November 25, 2025, Plaintiff sent a properly addressed dispute letter with sufficient postage, via certified mail, to Trans Union stating that the National Credit and TXU Energy accounts were the result of identity theft and should be removed from her credit file. Plaintiff included a copy of her photo ID, proof of her social security number, copies of her June 2024 and November 2025 FTC Identity Theft Reports, and her August 2025 Philadelphia Police Department report with this dispute to Trans Union.

71.    On November 25, 2025, Plaintiff sent a properly addressed dispute letter with sufficient postage, via certified mail, to Experian stating that the National Credit, TXU Energy and BPO accounts were the result of identity theft and should be removed from her credit file. Plaintiff included a copy of her photo ID, proof of her social security number, copies of her June 2024 and November 2025 FTC Identity Theft Reports, and her August 2025 Philadelphia Police Department report with this dispute to Experian.

72.    On or about December 3, 2025, Plaintiff received a response to her November 2025 dispute from Trans Union stating that it had not processed Plaintiff's identity theft block request because it was missing personal identifying information, did not include account numbers and names of creditors, and the description of the identity theft was too vague. However, Plaintiff had included a copy of her photo ID, proof of her social security number, account numbers, creditor names and FTC Identity Theft affidavits detailing the identity theft with her November 2025 dispute to Trans Union.

73.    On or about December 3, 2025, Plaintiff received another response to her November 2025 dispute from Trans Union stating that it had received Plaintiff's request, however

it needed additional identification. Plaintiff had already included a copy of her photo ID and social security card with her November 2025 dispute to Trans Union.

74.    On or about December 18, 2025, Plaintiff received a response letter from TXU Energy stating that it received her request to verify the debt and stated that the debt was valid. TXU Energy included a payment history ledger with its response to Plaintiff.

75.    On December 30, 2025, Plaintiff received another response letter from Trans Union stating that had verified the National Credit and TXU Energy accounts with the furnishers of the accounts.

76.    Plaintiff never received a response from Experian to her November 2025 dispute.

77.    Plaintiff never received a notification from Experian that an identity theft block was processed or declined regarding the fraudulent National Credit, TXU Energy and BPO accounts.

78.    On January 15, 2026, Plaintiff accessed her credit reports again, and to Plaintiff's dismay, found Experian and Trans Union were still reporting the fraudulent National Credit and TXU Energy accounts as derogatory accounts that were in collections with past due balances. In addition, Experian was still reporting the BPO account as a derogatory account that was in collections with a past due balance of $202.00.

79.    On February 17, 2026, Plaintiff accessed her credit reports again, and to Plaintiff's dismay, found Experian and Trans Union were still reporting the fraudulent National Credit and TXU Energy accounts as derogatory accounts that were in collections with past due balances. In addition, Experian was still reporting the BPO account as a derogatory account that was in collections with a past due balance of $202.00

80.    Upon information and belief, Defendants failed to evaluate or consider any of Plaintiff's information, claims, or evidence, and did not make sufficient—if any—attempts to

17

remove the disputed and fraudulent items within a reasonable time following Defendants' receipt of Plaintiff's disputes.

81.    Plaintiff has taken innumerable steps to combat the false reporting that has resulted from the theft of her identity, including the below Police and Identity Theft Reports:

- June 7, 2024: Submitted a Federal Trade Commission ("FTC") Identity Theft Report regarding three fraudulent accounts, including the National Credit account with a balance of $5,915.00;

- July 1, 2024: Filed a report with the Philadelphia Police Department regarding the fraudulent accounts discovered on her credit reports

- November 13, 2025: Filed a report with Philadelphia Police Department regarding six fraudulent accounts discovered on her credit reports, including the National Credit account with a balance of $5,915.00 and the TXU Energy account with a balance of $946.00;

-  November 18, 2025: Submitted an FTC Identity Theft Report regarding five fraudulent accounts, including the TXU Energy account with a balance of $946.00;

- November 24, 2025: Submitted an FTC Identity Theft Report regarding two fraudulent accounts, including the BPO account with a balance of $202.00.

82.    Further, prior to reporting the collection of the fraudulent BPO collection account to the credit reporting agencies, Defendant BPO failed to notify Plaintiff of the possible reporting under Regulation F. 12 CRF part 1006. Rather, Defendant BPO "parked" the adverse information on Plaintiff's credit reports without providing advanced notice in an attempt to collect on the false and fraudulent BPO account.

83.    Despite Plaintiff's efforts, and despite providing the FTC Identity Theft Reports and police reports to Defendants, Plaintiff is still burdened by the fraudulent and derogatory information that Defendants continue reporting on her credit.

84.    Upon information and belief, Defendants are all continuing to inaccurately report fraudulent and derogatory information as belonging to Plaintiff.

18

***The CRA Defendants Did Not and Do Not***
***Conduct Any Investigation of Most Consumer Disputes***

85.     Unknown to Plaintiff until recently, it has long been the practice of the CRAs to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Trans Union and non-party CRA Equifax use a vendor which was previously known as Intelenet Global Services and is now known as Teleperformance.

86.     Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[2]

87.     Trans Union first receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania. Then, it sends those batches to Teleperformance agents.

88.     Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

89.     Teleperformance agents and Experian Chile are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

---

[2] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue  her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Equifax for its farming-out investigations to Teleperformance.

19

90.    The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

91.    In fact, Trans Union and Experian both strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Trans Union or Experian.  The dispute is sent to the Defendant CRAs' creditor customers (such as National Credit and TXU Energy) for their sole review and consideration.

92.    Both Trans Union and non-party CRA Equifax have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

93.    Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

20

94.     Regardless of whether these statements by the CRAs are correct, the consumer reporting agencies believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

95.     Trans Union and Experian themselves did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused the disputes to be removed from their control to be saved within a database by an overseas data-processing vendor.

### The CRA Defendants Forwarded Plaintiff's Disputes to National Credit & TXU Energy, Who Did Nothing

96.     In each instance in which Plaintiff disputed a Furnisher account with the CRAs, the CRAs forwarded Plaintiff's disputes to the Furnishers using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results are electronically communicated back to CRAs.

97.     On information and belief, e-Oscar is also the system by which each Furnisher has agreed it will accept consumer disputes from the CRAs.

98.     Each time that a Furnisher received one of Plaintiff's disputes from a CRA, that Furnisher became obligated under the FCRA to investigate that dispute.

99.     Plaintiff's disputes to National Credit to attempt to have it investigate her complaints went unanswered.

100.    Plaintiff's disputes to TXU Energy to attempt to have it investigate her complaints went unanswered.

101.    The Furnishers failed to investigate Plaintiff's complaints.

102.    Despite Plaintiff providing the Furnishers with ample notice that she is a victim of identity theft and she does not owe the debts, the Furnishers continued (and continue still) to report the fraudulent accounts as "accurate" to the CRAs. Discovery will show that all either Furnisher

21

did when supposedly investigating Plaintiff's disputes from the CRAs was consult its own internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

103.    On dates better known to the CRAs and National Credit, the CRAs furnished Plaintiff's disputes to National Credit.

104.    On dates better known to the CRAs and TXU Energy, the CRAs furnished Plaintiff's disputes to TXU Energy.

105.    At least one of the Defendant CRAs responded to Plaintiff's disputes, claiming the information was "verified" as accurate. These responses confirm that the Defendant CRAs communicated Plaintiff's disputes to the Furnishers.

106.    Upon information and belief, the Defendant CRAs timely notified the Furnishers of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

107.    Alternatively, the Defendant CRAs failed to notify the Furnishers of Plaintiff's disputes, and/or failed to provide the supporting documents submitted with Plaintiff's disputes.

108.    By its actions as described herein, National Credit furnished and communicated false credit information regarding Plaintiff.

109.    By its actions as described herein, TXU Energy furnished and communicated false credit information regarding Plaintiff.

### *Plaintiff Suffered Actual Harm*

110.    Defendants continued to report the fraudulent and derogatory information on Plaintiff's credit reports even after being notified repeatedly that this information is false. Upon information and belief, Defendants are *still* reporting the fraudulent information on Plaintiff's credit files.

111.    As a result of the inaccurate credit reporting and refusal to correct Plaintiff's reports, Plaintiff has suffered damages, including, but not limited to:

    a.  Harm to her credit scores and credit opportunities;

    b.  Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

    c.  Loss of time attempting to correct the inaccuracies;

    d.  Stress associated with attempting to resolve this matter;

    e.  Loss of privacy;

    f.  Harm to reputation;

    g.  Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

### *Defendants' Conduct was Willful*

112.    The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

113.    Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

114.    As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed.  The CRA

Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

115.    The CRA Defendants have received numerous disputes and other complaints regarding the Furnishers at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

116.    For example, just in federal court alone, in the past decade, National Credit has had to defend over 550 consumer credit lawsuits.

117.    In many of these FCRA lawsuits brought by a consumer, one or both of the CRA Defendants were named co-defendants.

118.    The CRA Defendants knew or should have known of this litigation history.

119.    The CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

120.    The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

121.    Each Defendant regularly receives unredacted consumer dispute details from this database.

122.    Since the database began accepting complaints, the CFPB has sent millions of consumer credit reporting complaints to Trans Union.

123.    Since the database began accepting complaints, the CFPB has sent millions of consumer credit reporting complaints to Experian.

124.    Further, more than 270,000 of the CFPB complaints as to Trans Union and over 280,000 complaints about Experian were based largely on their failures to reasonably investigate consumer disputes.

125.    Just in the last 12 months alone, Trans Union and Experian have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

126.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

127.    The CRAs have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of

law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

128.    Fellow CRA Equifax has even been warned by its home District Court in Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005). The CRA Defendants are aware of this warning.

129.    Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

130.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

131.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3]  The AG Settlement required, amongst many changes and mandates, that the CRA Defendants comply with § 1681i(a).

132.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the CRA Defendants did not meaningfully comply with the AG Settlement in these regards.

133.    In early 2025, almost two decades after the AG settlement, the Consumer Financial Protection Bureau sued CRA Defendant Experian, seeking injunctive relief, redress, disgorgement, and civil money penalties. In its Complaint, CFPB alleged that:

> Experian violated both [the Fair Credit Reporting Act and the Consumer Financial Protection Act of 2010] by failing to reasonably reinvestigate consumer disputes challenging the accuracy or completeness of information in consumer reports, including by failing to forward all relevant information to furnishers, failing to provide adequate or accurate notice to consumers of the outcome of their disputes, and failing to utilize reasonable procedures to ensure the accuracy and completeness of information in consumers' files.

*Consumer Fin. Prot. Bureau v. Experian Information Solutions, Inc.*, 8:25cv24 (C.D. Cal. Filed Jan. 7, 2025).[4]

---

[3]    *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

[4] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_experian-information-solutions-complaint_2025-01.pdf

27

134.    As the CFPB summarized, "Despite its obligations under the FCRA, Experian fails consumers who dispute information in their consumer reports at every step of the dispute process."

*Id.*

135.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[5]

136.    The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

137.    Among many of the CRA Defendants' accuracy failures, the NCLC Report discovered:

> • **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority

---

[5] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

138.    The overwhelming amount of public criticism and growing awareness of the CRAs' failures has led at least one Defendant CRA, Experian, to frequently push for arbitration in lieu of litigation. Addressing so many cases though arbitration has lowered Experian's exposure to justice through the court system. However, arbitrators recognize the substantial amount of evidence demonstrating that Experian willfully disregards the rights of consumers under the FCRA, and they are awarding damages accordingly. In *Duncan v. Experian Information Solutions, Inc.*, which shared many similarities to the underlying facts in this case, Experian reported inaccurate information from PNC Bank on Mr. Duncan's Experian credit report. Although Mr. Duncan disputed the information with Experian, Experian failed to conduct any actual "reinvestigation" of Mr. Duncan's disputes, as required by Section 1681i of the Federal Fair Credit Reporting Act. Instead, Experian relied entirely on the information sent to it by the "furnisher", PNC Bank. The arbitrator in the Duncan case ordered Experian to pay Mr. Duncan "for actual damages $400,000,

29

together with $50,000 for each month it continues to report the PNC information, up to a maximum of another $300,000." The arbitrator further found Experian's violations to be willful, and ordered that Experian pay Mr. Duncan $700,000 in punitive damages.

139.    Proportionately similar to the litigation history against the CRAs, National Credit has also been sued in federal court over 550 times in the past decade for consumer credit claims by consumers – many involving alleged violations of the FCRA.

140.    TXU Energy has been sued dozens of times in the last decade for alleged consumer credit violations.

141.    Further, the CFPB has received over 1,900 complaints from consumers regarding National Credit reporting inaccurate information on consumer credit reports. Over 460 of these complaints are about National Credit not fixing a credit reporting error after receiving a consumer's dispute.

142.    National Credit had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

143.    TXU Energy had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

144.    National Credit had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

145.    TXU Energy had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d

30

1295 (11th Cir. 2016).

146.    National Credit had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

147.    TXU Energy had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

148.    National Credit had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

149.    TXU Energy had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

150.    National Credit had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

151.    TXU Energy had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

152.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because they believe that it would cost too much money to do so.

153.    Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:

31

**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b)**
*against Experian and Trans Union*

154.    Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

155.    Trans Union and Experian both violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the fraudulent account information from Defendant Furnishers and BPO.

156.    As a result of Trans Union's and Experian's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: harm to her credit scores and credit opportunities; costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

157.    Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customer, Trans Union and Experian each ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

158.    Trans Union and Experian each furnished multiple consumer reports to third parties containing the inaccurate and derogatory accounts, and they did so after receiving notice of these inaccuracies.

159.    The violations by Trans Union and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

32

160.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Trans Union and Experian in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)**
*against Experian and Trans Union*

161.    Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

162.    Trans Union and Experian each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the items from each of Plaintiff's credit files.

163.    Trans Union and Experian each violated 15 U.S.C. § 1681i(a)(2) by their conduct which includes, but is not limited to, failing to send to the Furnishers and BPO all relevant information that they received with Plaintiff's disputes.

164.    Trans Union and Experian each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the fraudulent accounts.

165.    Trans Union and Experian each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

166.    After receiving Plaintiff's August 2024 and November 2025 dispute letters, Experian violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

167.    As a result of Trans Union's and Experian's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: harm to her credit scores and credit opportunities; costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

168.    The violations by Trans Union and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

169.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Trans Union and Experian in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III:**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681c-2**
*against Experian and Trans Union*

170.    Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

171.    Pursuant to 15 U.S.C. § 1681c-2(a) a consumer reporting agency shall block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of (1) appropriate proof of the identity of the consumer; (2) a copy of an identity theft report; (3) the identification of such information by the consumer; and (4) a statement by the consumer that the information is not information relating to any transaction by the consumer.

172.    Pursuant to 15 U.S.C. § 1681c-2(b) A consumer reporting agency shall promptly notify the furnisher of information identified by the consumer under subsection (1) that the

information may be a result of identity theft; (2) that an identity theft report has been filed; (3) that a block has been requested under this section; and (4) of the effective dates of the block.

173. Here, Plaintiff sent multiple dispute letters to the CRA Defendants explaining that the fraudulent account was the result of her identity being stolen. With these letters, she included proof of identity, detailed account information, copies of the Police Reports she filed, and copies of the FTC Identity Theft Reports she filed.

174. The CRA Defendants continued to report the fraudulent information on Plaintiff's credit files.

175. Each CRA Defendant violated 15 U.S.C. § 1681c-2(a) by its conduct, acts, and omissions in failing to block the reporting of information in Plaintiff's consumer file regarding the fraudulent accounts after receiving actual notice of the identity theft with supporting documentation.

176. Each CRA Defendant violated multiple sections of 15 U.S.C. § 1681c-2 by its acts and omissions, including, but not limited to, the following:

    a.    failing to block the reporting of information in Plaintiff's consumer credit file within 4 business days after receiving notice that the Fraudulent Account was the result of Plaintiff's identity being stolen in violation of § 1681c-2(a);

    b.    failing to promptly notify the Furnishers that the information in Plaintiff's consumer credit file may be the result of identity theft in violation of § 1681c-2(b)(1);

    c.    failing to promptly notify the Furnishers that an identity report has been filed regarding the fraudulent accounts in violation of § 1681c-2(b)(2);

    d.    failing to promptly notify the Furnishers that a block on Plaintiff's credit file had been requested and the effective dates of said block in violation of § 1681c-2(b)(3) and (4); and

177. As a result of each CRA Defendants' violations of 15 U.S.C. § 1681c-2, Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the

inaccurate information; harm to credit; loss of credit opportunities; loss of privacy; and mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

178.    These violations of § 1681c-2 were willful, rendering each CRA Defendant liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, each CRA Defendant was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

179.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from each CRA Defendant in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT IV**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(A) & (B)**
*against National Credit & TXU Energy*

180.    Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

181.    Each Defendant Furnisher violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after her disputes were furnished directly to it by Experian and Trans Union.

182.    Each Defendant Furnisher violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Experian and Trans Union forwarded Plaintiff's disputes to it.

183.    As a result of each Defendant Furnisher's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: harm to her credit scores and credit opportunities; costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

184. The violations by each Defendant Furnisher were willful, rendering each Defendant Furnisher liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, each Defendant Furnisher was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

185. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from each Defendant Furnisher in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT V
## VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(E)
### *against National Credit & TXU Energy*

186. Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

187. Each Defendant Furnisher violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete information from Plaintiff's file after receiving Plaintiff's disputes from the CRAs and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from the Furnishers' failures to investigate as articulated herein, after receiving notice of Plaintiff's disputes from the CRAs.

188. As a result of this conduct (the action and inaction of each Defendant Furnisher), Plaintiff suffered actual damages, including but not limited to: harm to her credit scores and credit opportunities; costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

189. The violations by each Defendant Furnisher were willful, rendering each Defendant Furnisher liable for punitive damages in an amount to be determined by the Court pursuant to 15

U.S.C. § 1681n. In the alternative, each Defendant Furnisher was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

190.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from each Defendant Furnisher in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT VI:**
**VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT**
**15 U.S.C. § 1692d & 12 C.F.R. § 1006.30(a) of Regulation F**
*against BPO*

191.    Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

192.    BPO violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692d, by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Plaintiff in connection with the collection of a debt.

193.    BPO began reporting on Plaintiff's credit before (i) speaking to Plaintiff about the debt in person or by telephone, or (ii) placing a letter in the mail or sending an electronic message to Plaintiff about the debt and waiting a reasonable period of time to receive a notice of undeliverability.

194.    The natural consequence of BPO's actions were to harass, oppress, or abuse Plaintiff in connection with the collection of a debt.

195.    As a result of this conduct (the action and inaction of BPO), Plaintiff suffered actual damages, including but not limited to: harm to her credit scores and credit opportunities; costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

196.    Plaintiff is entitled to actual and statutory damages against BPO, as well as reasonable attorney's fees and costs, pursuant to 15 U.S.C. 1692k.

## COUNT VII:
### VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT
### 15 U.S.C. § 1692f  & 12 C.F.R. § 1006.30(a) of Regulation F
### *against BPO*

197.    Plaintiff realleges and incorporates all other factual allegations set forth in this Complaint.

198.    BPO, violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692f. by using unfair or unconscionable means to collect or attempt to collect a debt.

199.    BPO began reporting on Plaintiff's credit before (i) speaking to Plaintiff about the debt in person or by telephone, or (ii) placing a letter in the mail or sending an electronic message to Plaintiff about the debt and waiting a reasonable period of time to receive a notice of undeliverability.

200.    It was unfair, unconscionable, and in violation of the FDCPA for BPO to "park" the debt on Plaintiff's credit without first contacting her.

201.    As a result of this conduct (the action and inaction of BPO), Plaintiff suffered actual damages, including but not limited to: harm to her credit scores and credit opportunities; costs associated with disputing the inaccurate information; mental and physical stress and aggravation; harm to reputation; and loss of privacy.

202.    Plaintiff is entitled to actual and statutory damages against BPO, as well as reasonable attorney's fees and costs, pursuant to 15 U.S.C. §1692k.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)    Award Plaintiff actual and punitive damages for violations of the FCRA by

Experian, Trans Union, National Credit, and TXU Energy;

(2)    Award Plaintiff attorney's fees and costs under the FCRA;

(3)    Award Plaintiff actual and statutory damages against BPO due to its violations of

the Fair Debt Collection Practices Act;

(4)    Award Plaintiff reasonable attorney's fees and costs against BPO under the Fair

Debt Collection Practices Act;

(5)    Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(6)    Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

KATHERINE ELISABETH PATTERSON

By:

/s/ Leonard A. Bennett
Leonard A. Bennett, VSB #37523
Mark C. Leffler, VSB #40712
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662- Fax
Email: lenbennett@clalegal.com
Email: mark@clalegal.com

*Counsel for Plaintiff*